IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 20, 2016 Session

## IN RE DESTINY H., ET AL.

**Appeal from the Chancery Court for Shelby County**
**No. CH1302901     Walter L. Evans, Chancellor**

_____

**No. W2015-00649-COA-R3-PT – Filed February 24, 2016**
_____

This appeal involves a petition to terminate a mother's parental rights on the grounds of abandonment by willful failure to support and willful failure to visit. We affirm the trial court's finding that grounds for termination do not exist as to either ground. Accordingly, we affirm the trial court's decision not to terminate the parental rights of the mother.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

JOHN EVERETT WILLIAMS, SP. J., delivered the opinion of the Court, in which BRANDON O. GIBSON, and KENNY ARMSTRONG, JJ., joined.

Vicki L. Green, Millington, Tennessee, for the appellants, Joanne and John H.

Shantell Sharay Suttle, Cordova, Tennessee, for the appellee, Jennifer L.

## OPINION

### I. Background

This appeal involves a petition for a termination of the biological parents' parental rights. Jennifer L. ("Mother") and biological father ("Father")[1] had two minor children,

_____

[1] The children's biological father consented to the termination and is not a party on appeal.

Destiny (born in 2006) and Joshua H. (born in 2008).[2] For a large portion of the children's lives, it appears that they had resided together in their paternal grandparents' home with their Mother and Father.[3] Sometime between 2006 and 2008, however, the paternal grandparents asked Mother and Father to leave the home because "things were missing in the house all of the time. . . ."[4] Subsequently, Mother moved in with her mother, Debbie P. ("Maternal Grandmother").

On April 5, 2010, the children were placed in the custody of their paternal grandmother, Joanne H. ("Paternal Grandmother"),[5] pursuant to an order of the Shelby County Juvenile Court, which adjudicated the children dependent and neglected and prohibited any contact between the children and Mother.[6] On January 3, 2013, Mother filed her first petition for visitation with the juvenile court.[7]

On February 28, 2013, Paternal Grandparents filed a petition in the Shelby County Chancery Court to terminate the parental rights of Mother and to adopt the children. The grounds for termination alleged in the petition were abandonment by willful failure to support and visit. Paternal Grandparents also asserted that it was in the children's best interest to terminate Mother's parental rights. In the chancery court, Mother filed another petition for visitation on March 6, 2014.

On February 23, 2015, the chancery court conducted a trial on the petition to terminate. Several witnesses testified, including Mother, Paternal Grandparents, a school counselor, several law enforcement officials, and the children's Maternal Grandmother.

Mother testified that the last time she saw the children was on April 5, 2010, the day Paternal Grandparents were awarded custody. She stated that she took the children to

---

[2] In termination of parental rights cases, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[3] At one point, Destiny resided with her Maternal Grandmother and Mother for two months, but the specific dates are unclear from the record.

[4] According to testimony, Mother and Father were stealing items from the home to support their drug habit.

[5] The record indicates that Paternal Grandmother is the children's father's maternal grandmother (i.e. biologically, she is the children's great-grandmother), but she is the children's paternal grandmother because she adopted the father of the children.

[6] Although made an exhibit at trial (as indicated by the trial transcript in the record on appeal), the juvenile court's order does not appear in the record.

[7] Again, this petition, along with the rest of the record from the juvenile court proceedings, is not contained within the record on appeal.

Maternal Grandmother's house on that day, and Maternal Grandmother took the children to Paternal Grandparents' home. Mother's testimony regarding her understanding of the juvenile court's no contact order is confusing. Mother testified that she never received notice of the custody hearing and, therefore, did not participate in those proceedings.[8] Mother testified that for a period of time, she believed she had the right to visitation based upon statements made by someone at the juvenile court. Mother contended, however, that Paternal Grandparents never allowed visitation.[9]

Eventually, Mother learned about the no contact order entered by the juvenile court and filed her first petition for visitation in January 2013. The date that Mother learned about the no contact order, however, is unclear from Mother's testimony, as Mother testified that she delayed in requesting visitation due to her continued drug abuse and subsequent unsuccessful attempts at rehabilitation. She stated that she eventually completed some sort of rehabilitation[10] and filed the petition because she had "completed my treatment and I wanted to start visitation. Because I know I had to go through treatments, what I was told, before I'd even - - they'd even allow me to see my children." Additionally, Mother stated that it became harder to get in contact with Paternal Grandparents, and eventually the cell phone number she used to reach Paternal Grandmother indicated it was disconnected. Mother admitted, however, that she could still reach Paternal Grandmother's husband, John H., ("Paternal Grandfather"), on his cell phone.[11]

With regard to support, Mother testified that she has "no idea" how much money she had given to Paternal Grandparents for the care of the children. She testified that she "put money in cards. I've put it in their mailbox. And then I stopped doing that because I found

---

[8] Mother and the children's father lived in Alabama and Florida for a period of time that is not clear from the record. Mother testified that she was living out of state at some points during the proceedings and was unaware of various hearings.

[9] Mother indicated that another order was entered before the April 5, 2010 order that prohibited contact with the children. She testified that the previously entered order "gave [her] supervised visitation." Unfortunately, this order does not appear in the record on appeal and is not expounded upon any further in the testimony.

[10] Neither party introduced any of Mother's records from rehabilitation or treatment at trial.

[11] Mother married sometime in 2013 and was married for several months before her husband passed away. At trial, Mother testified about the circumstances surrounding her husband's death in September 2013. Mother's testimony on this issue is not relevant on appeal because we do not reach the issue of whether termination of her parental rights is in the children's best interest.

Additionally, Paternal Grandparents called two law enforcement officials, District Attorney General Matthew Stowe and Officer Andy Dickson, to testify about Mother's husband's death. However, counsel for Mother objected to most of the questions asked by opposing counsel. Thus, no evidence was elicited from either of the law enforcement officials that is relevant to this appeal.

out I can get in trouble for that." Mother recalled one instance where she had left $100 in cash in the Paternal Grandparents' mailbox. Still, she stated that she also did not remember what month or what year she provided any support. After learning of the no contact order, Mother testified that she began giving Maternal Grandmother money to deliver to Paternal Grandparents for the children because, at some point, Paternal Grandfather told Mother "never to step foot on their property." She also stated that Paternal Grandparents told her "they had everything they needed."[12] Still, she did not remember when or how much money she gave in total. With respect to Christmas presents, however, she stated that in 2012 she spent $500 for the children:

> Q. Now, from April 2010 until the filing of this in February 28th of 2013, how much support - - how much money have you given to the [Paternal Grandparents] to support your children?
>
> A. I have no idea. I never counted. I went and bought the Christmas before. Matter of fact, I don't remember which year, what year it was, but I also have pictures.[13]
>
> ***
>
> Q. . . . What necessaries did you provide [to the children]?
>
> A. Clothes, did toys and also give them money.
>
> Q. All right. You provided clothes. How many times did you provide clothes?
>
> A. I provided clothes at Christmas time.
>
> Q. How many clothes did you provide?
>
> A. How many clothes? I spent $500 one Christmas on clothes and toys, yes, ma'am, I did. Between both kids, it was [$]250 a piece.
>
> Q. Which Christmas was this?

---

[12] Mother testified that she "would even call Renee and Renee said that she gets them whatever they need." Neither parties' counsel sought to have Mother explain who Renee is. Additionally, neither party called Renee to testify at trial regarding Mother's attempts to provide support.

[13] The photographs were not presented at trial.

- 4 -

A. It was the Christmas went [sic] to their house and delivered them.

Q. What Christmas was that?

A. 2013 - - wait, '14, '13, '12.

Q. 2012?

A. Yes, ma'am.

Mother was employed sporadically throughout the years 2010 to 2014. She indicated that during this timeframe she worked at Dodge's Truck Stop, an antique store, and an IHOP restaurant. Mother testified that she worked at IHOP for four months in 2012 up until she entered a rehabilitation program in January 2013.[14] Still, Mother testified that she did not know how much her income was at any of her jobs[15] and that she did not file an income tax return for the years 2010 through 2015. She testified that after leaving rehabilitation, she was unemployed until the middle of 2013, but also stated she earned no income in 2013. At the time of trial in February 2015, Mother was employed but had not been paying any support to the children. Mother testified that she was unable to pay support during this time due to the no contact order, despite the fact that Mother had previously testified to using Maternal Grandmother as a conduit for support payments for the children. Additionally, Mother had another child in January 2015, whom she supports on her own. She testified that she currently lived in her own housing and said that she was financially able to support the children.

Paternal Grandmother testified that the children have lived with her and Paternal Grandfather since April 5, 2010. She acknowledged that Mother sent Christmas gifts once through Maternal Grandmother and that she gave them to the children. However, Paternal Grandmother denied that the children ever received any type of monetary support from Mother. Paternal Grandmother testified that Mother called "a lot to ask how [the children] were" but that she told Mother sometime in 2012 that Mother would be unable to contact the children anymore because of the no contact order.[16] She denied that she changed or

---

[14] The end date of Mother's employment at IHOP was not provided at trial. Thus, it is unclear how many days in January 2013 Mother worked, if any, before going to rehabilitation.

[15] Mother testified about what she made per hour, but did not testify about the number of hours she worked or how often she was paid. She testified that she was paid $10 per hour at the antique store and that she received $2.13 per hour and occasional tips at IHOP.

[16] Subsequently, Paternal Grandmother testified that she "told her about the no contact order for the children. But I didn't tell her I wouldn't talk to [Mother] because I did care about her. . . . She would call and talk to me and wanted to know if the kids were okay, yes. . . . And then would talk about other things, too, yes."

disconnected her phone number; instead, Paternal Grandmother testified that her number was the same number on which Mother had previously been able to reach her. She testified that she filed the petition to terminate Mother's parental rights and adopt the children because the parents were homeless after Paternal Grandmother asked them to leave her home. (It is unclear from the parties' briefs or record the time frame in which Mother resided with Paternal Grandparents.) She testified that she initially told Mother that once she completed a rehabilitation program she could attempt to regain custody, but after Mother filed her petition for visitation, Paternal Grandmother saw the need to petition for termination of parental rights.

Paternal Grandfather confirmed that Mother had provided Christmas presents for the children one year, and he estimated the total value of the gifts at fifty dollars. Paternal Grandfather also stated that Paternal Grandmother had actually changed her phone number, but their home phone number and his cell phone number remained the same. He stated that he and Paternal Grandmother were able to support the children financially and that they had never received any monetary assistance in supporting the children.

Destiny's school counselor, Jennifer Booker, testified about the emotional and behavioral problems Destiny exhibited while at school. Destiny, now a third grader, was referred to Ms. Booker when she was in first grade. She was referred to Ms. Booker by her teacher "because there was some inappropriate language that Destiny was using at the time with the two girls in the rest room." She testified that Destiny struggled in school but that she and Paternal Grandparents worked together to devise a plan for Destiny to visit a mental health counselor. Ms. Booker also stated that Destiny had communicated to her about her worry that Mother would take her away from Paternal Grandparents. Still, she testified that she was uncertain that Destiny's "acting out" always stemmed from Destiny's fear of her Mother and stated that it could be attributed to a "number of things," including Destiny's skill deficits. Ms. Booker testified that Joshua had also been referred to her based on an issue he had with sharing toys in the classroom, but she did not testify as to any issues surrounding Joshua's situation at home or with Mother.

Maternal Grandmother testified that she had knowledge of Mother's attempts to contact and support the children. She stated that "[Mother]'s tried to deliver Christmas gifts. And I've taken them to [Paternal Grandmother]'s . . . . And she's also sent money. She put some stuff in the mailbox for them. And she has tried to call them but she can't never talk to [the children] because either . . . they don't answer the phone or they don't want to talk to her."

Maternal Grandmother's testimony regarding support and Christmas presents for the children was also unclear. Regarding Christmas presents, Maternal Grandmother testified that she delivered the presents to the children on behalf of Mother "last year, year before last, 2013." Maternal Grandmother also testified that she delivered presents in "2012 and then

2011," although Mother indicated that she only sent gifts in 2012. Maternal Grandmother testified that knew the children received the "ones I took the first Christmas . . . because I told them it was from their mother." Maternal Grandmother also stated that she had her own Christmas presents for the children in 2013, and "I didn't get to give them to them," despite testifying that she had delivered presents on Mother's behalf in 2013. Additionally, the following exchange occurred:

> [Maternal Grandmother:] . . . I had the Christmas presents **from 2014** because I had carried one set to KFC because they said they wasn't going to be there so I couldn't come by and drop them off. . . . And we carried them in and gave them to [Paternal Grandmother]. Now, whether they got them or not, I don't know.
>
> Q. And that was in 2014?
>
> [Maternal Grandmother:] Yes - - no, **2013**.

(Emphasis added.). Later in her testimony, she stated that Mother did not make any regular payments in 2013 to the Paternal Grandparents "because they wouldn't even take her Christmas presents," despite the foregoing testimony that she had delivered the gifts in 2013. Still, she testified that she is uncertain whether the children ever received the cards or money that Mother allegedly placed in Paternal Grandparents' mailbox while the children lived with them. Maternal Grandmother also said that, at the time of trial, Mother was working at Harrell's Construction and that she worked for Maternal Grandmother's husband in 2013, earning ten dollars per hour and working forty hours per week.

On March 25, 2015, the chancery court entered an order on the petition to terminate Mother's parental rights and for adoption. Regarding failure to support, the chancery court found that Mother had attempted to provide support but that it was refused by the Paternal Grandparents. With respect to failure to visit, it found that "through attempts to enforce the no contact order . . . [Paternal Grandparents] denied [Mother and Maternal Grandmother] the opportunity to provide support for the children . . . and to visit with the children, despite attempts by the Mother and [M]aternal [G]randmother." Thus, the trial court concluded that neither Mother's failure to support nor her failure to visit was willful. Although the court did not find a ground for termination, the court also determined that it was in the children's best interest for Mother's rights not to be terminated.

On July 6, 2015, the chancery court entered an amended order addressing Mother's unresolved petition for visitation filed on March 6, 2014. The court dismissed the petition, concluding that it did not have subject matter jurisdiction to adjudicate the issue of visitation.

Paternal Grandparents timely appealed.

Appellants raise three issues on appeal:

> 1. Whether the trial court erred in finding that the Mother's failure to support the children was not willful.
>
> 2. Whether the trial court erred in finding that the Mother's failure to visit the children was not willful.
>
> 3. Whether the trial court erred in not allowing the testimony of the Petitioner's witnesses with regard to an ongoing criminal investigation into the actions of Respondent, pursuant to Tennessee Code Annotated Section 36-1-113(c)(2), with regard to whether it was in the best interest of the children that the adoption take place.

In the posture of Appellee, Mother presents an additional issue: Whether Appellant failed to comply with Tennessee Rules of Appellate Procedure 20(b) and 29(a)–(b).

## III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174–75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-

---

[17] Before we address the issues in this appeal, we point out that the contents of the record on appeal are conflicting and confusing. Parties referenced persons in testimony whose identities were not explained. Both parties' counsel casually refer to the years of events, often never eliciting testimony that would help this Court determine if an event occurred during the relevant four-month period, as discussed in detail *infra*.

With respect to the trial transcript, the table of contents omitted two witnesses who testified at trial. Further, the transcript was laden with grammatical errors and typographical errors that do not appear to be related to the parties' own dialect or speaking habits. Important exhibits, such as the juvenile court's orders, were completely omitted. The juvenile court's no contact order, which plays a large role in the ground of willful failure to visit, is completely omitted from the record on appeal despite being introduced into evidence at trial as Exhibit 1. Instead, the trial transcript lists a "Petition" as Exhibit 1.

R3-PT, 2005 WL 1021618, at \*7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

### IV. Grounds for Termination

In their petition to terminate Mother's parental rights, Appellants alleged two grounds: abandonment by willful failure to visit the children and abandonment by willful failure to support. We begin with the ground of abandonment generally. Tennessee Code Annotated Section 36-1-102 defines "abandonment," in relevant part as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or a guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or

> parents or a guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(i).

The statutory definition of "abandonment" requires us to focus on the "period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights[.]" Tenn. Code Ann. § 36-1-102(1)(A)(i). In the present case, the four-month period for purposes of establishing abandonment by failure to visit and support is November 28, 2012, through February 27, 2013, the day before the petition was filed.

In order for a court to terminate a parent's parental rights on the ground of abandonment, that abandonment must be willful. In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), this Court discussed willfulness in the context of termination of parental rights cases:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months . . . . In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing . . . .
>
> *   *   *
>
> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. *In re M.J.B.*, 140 S.W.3d at 654; *see also Shorter v. Reeves*, 72 Ark.App. 71, 32 S.W.3d 758, 760 (2000); *In re B.S.R.*, 965 S.W.2d 444, 449 (Mo. Ct. App. 1998); *In re Estate of Teaschenko*, 393 Pa.Super. 355,

574 A.2d 649, 652 (1990); *In re Adoption of C.C.T.*, 640 P.2d 73, 76 (Wyo. 1982). . . .

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d at 863–64 (internal citations and footnotes omitted).

"Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). As previously discussed, this Court reviews questions of law *de novo* with no presumption of correctness. *Id.* We turn to the types of abandonment alleged against Mother in this case.

### A. Abandonment by Willful Failure to Visit

We begin with abandonment by willful failure to visit. With respect to this ground, abandonment may be proven by establishing "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Here, there is no dispute that Mother had no visitation with the children during the relevant four-month period. Mother argues, however, that her failure to visit was not willful because she was prevented from visiting by the no contact order. Paternal Grandparents argue that Mother's failure to visit with the children was willful because she made no attempt until January 2013 to modify the no contact order in place that prevented her from visiting the children. They assert that Mother knew she had to complete some sort of rehabilitation or counseling program pursuant to the order before regaining visitation with the children. The trial court's order provides that Mother's failure to visit was not willful because Mother was denied the opportunity to visit "through [Paternal Grandparents'] attempts to enforce the no-contact order issued by [j]uvenile [c]ourt . . . ."

Unfortunately, our review on this issue is hindered because the no contact order was not included on the record on appeal.[18] When a party seeks appellate review, it is well-established that the party has a "duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the

---

[18] Although the transcript indicates that the juvenile court's order including the no contact provision was entered as Exhibit 1 at trial, the trial transcript's table of contents indicates that Exhibit 1 is a "Petition." Regardless, we are unable to discern the nature of the exhibit because of its omission from the record.

appeal." ***State v. Ballard***, 855 S.W.2d 557, 560 (Tenn. 1993) (citing ***State v. Bunch***, 646 S.W.2d 158, 160 (Tenn. 1983)). In this case, the no contact order preventing Mother from visiting the children is necessary for a determination of what, if any, conditions were placed upon Mother before she was able to obtain visitation. At trial, both parties referenced a requirement that Mother was to attend some sort of rehabilitation before she would be awarded visitation. However, we cannot rely upon the parties' differing characterizations of the conditions imposed upon Mother. In their brief, Appellants refer to the requirement imposed upon Mother as "treatment," while Mother testified she had to complete "alcohol and drug counseling." Moreover, other testimony indicated that the program to be completed by Mother must have also been "recommended" to her. Yet another point in the testimony indicates that Mother had to attend a "rehab" program. For this Court to determine whether Mother willfully failed to complete the specifics of such requirements, it is imperative that this Court examine the order imposing such requirements.

Here, the trial court found that Paternal Grandparents' attempts to enforce the no contact order prevented Mother from exercising visitation with the children. Respectfully, Paternal Grandparents were under an obligation to obey the juvenile court's no contact order until modified otherwise. *See* ***State v. Jones***, No. 2, 1985 WL 4229, at *1 (Tenn. Crim. App. Nov. 27, 1985), *aff'd*, 726 S.W.2d 515 (Tenn. 1987). Neither party has challenged the propriety of the juvenile court's prohibition on contact between Mother and her children, and thus, Paternal Grandparents were obliged to follow the juvenile court's order. To this end, the trial court erroneously found that their "attempts to enforce the no-contact order" precluded a finding of willfulness on Mother's behalf. Instead, without addressing the propriety of the juvenile court's order, this Court must examine whether Paternal Grandparents can demonstrate that Mother's actions demonstrate a willful failure to visit by not complying with the conditions imposed upon her in the juvenile court order.

Unfortunately, the testimony at trial sheds little light on whether Mother undertook or completed the conditions imposed upon her. It is important to note that neither party disputes that Mother did complete some sort of program or treatment, although the specifics are unclear, within the relevant four-month period. Equally important, Paternal Grandparents conceded at trial and in their appellate brief that Mother had begun rehabilitation for her drug abuse issues in January 2013. Thus, both parties recognize that during the relevant four-month period Mother had undertaken to complete at least some of the requirements placed upon her by the juvenile court in order to regain visitation. With no clear and convincing evidence regarding the exact requirements that Mother was required to meet, coupled with evidence that Mother had completed a program of treatment during the four-month period, we decline to conclude that Paternal Grandparents have presented sufficient clear and convincing evidence that Mother willfully failed to visit her children, especially in light of Paternal Grandparents' failure to ensure that the no contact order was included in the record on appeal. Importantly, when the record before this Court is incomplete, and does not contain

the proceedings relevant to an issue on appeal, this Court "must conclusively presume that the ruling of the trial court was correct." *State v. Locke*, 771 S.W.2d 132, 138 (Tenn. Ct. App. Dec. 15, 1988), *perm. app. denied* (Tenn. May 8, 1989). Thus, we affirm the trial court's finding that Paternal Grandparents have not proven by clear and convincing evidence that Mother's failure to visit was willful.

## B. Abandonment by Willful Failure to Support

The trial court concluded that the ground of abandonment by willful failure to support had also not been proven by clear and convincing evidence. The trial court found that Mother's failure to support was not willful because Paternal Grandparents refused any support that Mother attempted to provide. For purposes of this subdivision of abandonment, "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the "willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is defined as support that "under the circumstances of the individual case, is insignificant given the parent's means." *Id.* at (1)(B).

In their brief and at oral argument, Paternal Grandparents were adamant that Mother failed to carry her burden to prove that she complied with the child support statute. Respectfully, the opposite is true. *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010) ("The party petitioning for termination carries the burden of making both of these showings [as to the ground for termination and best interest of the child].") (citing *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004); *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004)). It is well-established that Paternal Grandparents, as the party seeking termination, rather than Mother, carry the burden of proving by clear and convincing evidence that Mother willfully failed to provide regular support to the children. *In re Noah B.B.*, No. E2014-01676-COA-R3-PT, 2015 WL 1186018, at *9 (Tenn. Ct. App. Mar. 12, 2015) ("The burden to prove Mother's abandonment by willful failure to support rests squarely on the petitioners."). Additionally, the burden in termination of parental rights cases, as discussed above, is high. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005) ("Because the stakes are so profoundly high, Tenn. Code Ann. § 36–1–113(c)(1) requires persons seeking to terminate a biological parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence. This heightened burden of proof minimizes the risk of erroneous decisions.").

As we recently stated, it is "not enough for a petitioner to simply prove that Mother was not disabled during the relevant timeframe and therefore assume that she was capable of working and paying child support." *Noah B.B.*, 2015 WL 1186018, at *9 (citing *In re Josephine E.M.C.*, No. E2013-02040-COA-R3-PT, 2014 WL 1515485, at *18 (Tenn. Ct. App. Apr. 17, 2014), *perm. app. denied* (Tenn. July 23, 2014)) (internal quotations omitted).

Paternal Grandparents must also have demonstrated clear and convincing evidence to establish that Mother "had no justifiable excuse for not providing support to the child." *Id.* As in *Noah B.B.*, we must conclude that Paternal Grandparents have simply failed to present sufficient evidence to "eliminate any serious or substantial doubt" about whether Mother's failure to support was willful. *See Noah B.B.*, 2015 WL 1186018, at \*9; *see also In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) ("Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.") (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

We take guidance first from the Tennessee Supreme Court's decision in *In re Adoption of Angela E.*, 402 S.W.3d 636 (Tenn. 2013), which held that the petitioners in a termination of parental rights case failed to clearly and convincingly prove that the child's father had willfully failed to support the child. *Id.* at 641. The Court opined, "A party seeking termination of parental rights must prove by clear and convincing evidence that the opposing party had the capacity to pay support but made no attempt to do so and did not possess a justifiable excuse." *Id.* In *Adoption of Angela E.*, the child's father made payments for the child during the relevant four-month period in the amount of $3,500 total, despite owing approximately $10,000 and earning $150,000 annually. *Id.* Still, the Court opined that it was not enough for petitioner to demonstrate that father earned income. *Id.* Instead, the Court concluded that where petitioners failed to provide evidence demonstrating father's monthly expenses, and thus, his ability to pay, they had not met their burden to prove father willfully failed to support the child. *Id.*

In this case, the evidence presented by Paternal Grandparents is much more sparse and less convincing than that presented in *Adoption of Angela E.* Paternal Grandparents did not submit clear and convincing evidence regarding Mother's employment, income, other non-monetary assets, or expenses during the four-month period. Although conflicting testimony was presented with respect to the income Mother earned, this Court is unable to ascertain whether Mother earned any income or had any expenses during the relevant four-month period. As noted above, the four month period extends from November 28, 2012, through February 27, 2013, but the only evidence concerning Mother's employment is stated in terms of years, thus rendering it impossible to know if Mother was employed specifically during the four months preceding the filing of the petition. Regarding the year 2012, Mother testified that she worked at an antique store earning $10 per hour and IHOP earning $2.13 per hour plus "sometimes" earning tips. Mother also testified, however, that she was unemployed "from the beginning of 2012 until the middle of 2013." Indeed, Maternal Grandmother testified that Mother earned income during the year 2013 but did not specify which months. Confusingly, later on during the trial, Mother testified that she had no income for 2013.[19]

_____

[19] During Mother's testimony, counsel for Paternal Grandparents and Mother had the following

Paternal Grandparents did not undertake to explain this discrepancy at trial, and instead, in their brief, they premise their entire argument upon the confusing and conflicting testimony surrounding whether Mother left money in their mailbox at some point in 2012 or 2013. Even more glaring, at trial, Paternal Grandparents did not present any evidence concerning Mother's expenses during the four-month period.[20]

Very recently, this Court considered a similar issue in *In re Saliace P.*, No. W2015-01191-COA-R3-PT, 2016 WL 304543 (Tenn. Ct. App. Jan, 26, 2016), holding that the petitioner failed to prove the ground of abandonment by willful failure to support when "the record is devoid of evidence that [m]other earned **any** income during the relevant four-month period," despite the fact that mother testified that she performed some odd jobs during the year prior to the filing of the termination petition. *Saliace*, 2016 WL 304543, at *5. Although the petitioner in *Saliace P.* pointed to the mother's limited expenses, we concluded that such sparse evidence did not provide a full picture into the mother's capacity to provide support. *Id.*

Similarly, in the case at bar, we must conclude that the scant and conflicting evidence concerning Mother's employment does not provide sufficient insight into her total income earned or her expenses during the relevant four-month period so as to provide clear and convincing evidence that any failure to support was willful. Moreover, Mother was never asked at trial if she had a justifiable excuse for not obtaining employment during the relevant

---

exchange:

> Q. All right. So going back, you worked in 2010, 2011 and 2012?
> A. Yes.
> Q. Is that correct?
> A. Uh-huh (affirmative response).
> Q. You did not work in 2013?
> A. No.
> ***
> Q. So the only year that you did not earn income was 2013?
> A. Yes.

Part of this Court's confusion stems from the parties' tendencies to refer to the time periods in this case by years and not months. For many of the grounds for terminating a parent's parental rights, this Court focuses on the four-month period preceding the filing of the petition with slight exception. The parties did little to ensure that this Court could ascertain Mother's income, expenses, or other endeavors during the relevant time period.

[20] When asked whether she sent any type of support in 2010, 2011, 2013, or 2014, Mother testified that she had put money in cards and placed them in the Paternal Grandparents' mailbox. However, she stated that she "stopped doing that because I found out I can get in trouble for that." Counsel for Paternal Grandparents did not seek to clarify whether the money was placed in the mailbox during the relevant four-month period and did not seek to have Mother explain what "trouble" she would have encountered in doing so.

time period; indeed, for at least some part of the four-month period, it appears Mother was attempting to remedy her drug problems through some sort of rehabilitation. As explained by the *Saliace P.* Court, "the burden to prove abandonment by willful failure to support rests with" the party seeking termination. *Id.* Accordingly, it was Paternal Grandparent's burden to illicit lucid and intelligible evidence regarding Mother's ability to pay support and whether her failure to do so was justified so as to remove any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Respectfully, the testimony in this case does not meet that exacting standard. Thus, because the record does not contain clear and convincing evidence that Mother had the capacity to pay support during the four months preceding the petition, we affirm the trial court's finding regarding this ground. Because we have concluded that no ground for termination of Mother's parental rights has been proven by clear and convincing evidence, we need not address the best interest of the children. Additionally, all other issues raised by the parties are pretermitted.[21]

## VII. Conclusion

For the foregoing reasons, we affirm the order of the Chancery Court of Shelby County. The case is remanded to the trial court for all further proceedings as may be necessary and consistent with this Opinion. Costs of this appeal are assessed against the Appellants Joanne and John H., and their surety, for which execution may issue if necessary.

_____
JOHN EVERETT WILLIAMS, JUDGE

---

[21] As noted above, Paternal Grandparents raised the issue of whether the trial court erred in "not allowing the testimony of [their] witnesses with regard to an ongoing criminal investigation into the actions of [Mother], pursuant to **TCA § 36-1-113(c)(2)**[, which refers to the second element of termination, best interest of the child], with regard to whether the it [sic] was in the **best interest of the children** that the adoption take place." (Emphasis added.) At trial, Paternal Grandparents unsuccessfully argued that these witnesses' testimony was relevant to Mother's credibility even as related to the grounds for termination; however, it appears they have abandoned this argument on appeal because they do not raise it as an issue or argue it in their appellate brief. *Forbess v. Forbess*, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011) (holding that husband waived an issue by his failure to designate it as an issue in his statement of the issues); *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006) (holding that the "failure of a party to cite any authority or to construct an argument regarding his position on appeal constitutes waiver of that issue"). Thus, because we have found that Paternal Grandparents did not prove a ground for termination existed by clear and convincing evidence, we do not reach the issue of the children's best interest.